IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN E. GROVE,<br><br>               Plaintiff,<br><br>v.<br><br>MML INVESTORS SERVICES, LLC, et al.,<br><br>               Defendants. | CIVIL ACTION<br><br>No. 25-2133-KSM |

**MEMORANDUM**

**MARSTON, J.**                                                                                          **July 29, 2025**

       This is an insurance dispute involving a flexible premium multifunded life insurance policy that Plaintiff John E. Grove purchased in May 1994. Grove alleges that despite investing more than $96,000 in the accounts tied to his policy, he was informed in January 2025 that his policy's cash value was less than $350. He brings state common law and statutory negligence claims against Defendant MML Investors Services, LLC ("MML"), which oversaw the accounts associated with Grove's Policy, and MML's parent company, Defendant Massachusetts Mutual Life Insurance Company ("MassMutual"). Defendants move to dismiss the Complaint in its entirety, arguing that Grove's claims are barred by the relevant statutes of limitations and, in the alternative, that he has failed to state a claim upon which relief can be granted. For the reasons discussed below, the motion is granted.

I.  **BACKGROUND**[1]

    A.  **Grove's Policy**

On May 24, 1994, Grove purchased a MetLife Flexible Premium Multifunded Life Insurance Policy (the "Policy") with a face amount of insurance totaling $250,000.  (Doc. No. 1-1 at 5, 13.)  As the name suggests, the Policy allowed for flexible premium payments and diverse investment of those payments.

Grove's premium payments were divided between a "fixed account" and a "separate account" at his discretion.  Any cash placed in the fixed account was not invested, and instead, was subject to a fixed interest payment of 4% per year compounded annually.  (*Id.* at 21–22.)  Within the separate account, by contrast, cash inputs were allocated into subaccounts—referred to as "investment divisions"—with each subaccount subject to a different investment strategy and holding a separate class or series of stocks.  (*Id.* at 23–26.)  In 1994, the initial investment allocation for the separate account under Grove's Policy was aggressive:  40% growth, 20% diversified, 20% aggressive, and 20% international stocks.  (*Id.* at 14; *see also id.* at 42 (outlining same allocation on application for insurance); *id.* at 6 (Grove conceding that he "was informed about the nature of this investment vehicle at the time he paid for it in 1994").)  The gains and losses realized from these investments were to be credited to or charged against the separate account.  (*Id.* at 23.)  Grove, as the policyholder, could change how his premium payments were allocated "among the Fixed Account and/or the Investment Divisions of the Separate Account." (*Id.* at 25; *id.* at 42 (application for insurance, which states "[t]he percentage will apply to future premiums unless changed by the owner").)  To do so, he simply had to notify MetLife "in

---

[1] "The District Court, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

writing of a change in the allocation of percentages." (*Id*. at 25.) Any change would "take effect immediately upon receipt" of the notice. (*Id.*)

For the first two policy years, Grove was required to make at least $390 annually in premium payments. (*Id.* at 14, 21.) After that, each planned premium payment was set to be "at least $200 annually," but Grove had the option to "skip planned premium payments or change their frequency and amount," so long as the "cash surrender value" of the Policy remained "large enough to keep [the] policy in force." (*Id.* at 21, 29.) As relevant here, the cash surrender value for Grove's Policy was the sum of the cash value of the fixed account and the cash value of the separate account, minus a nominal surrender charge. (*Id.* at 19.)[2] If the cash surrender value fell below the monthly deduction—calculated as the sum of the "monthly cost of term insurance," the "monthly cost of any benefits provided by riders," and a "base administration charge" (*id.* at 21)[3]—then Grove would be given 61 days to submit a premium payment sufficient to "cover two monthly deductions." (*Id.* at 29.) If Grove missed the grace period, then the "policy w[ould] end, without value." (*Id.*)

B.     The Policy's Value

When Grove first purchased the Policy in 1994, he transferred $24,000 to MetLife, and over the next 30.5 years, he paid $170 per month in premiums, resulting in a total cash investment of $96,420. (*Id.* at 5.) Grove does not explain how these payments were allocated between the Policy's fixed and separate accounts, but given that he claims his "investment has completely evaporated," it is reasonable to assume that most, if not all, of the premiums paid

---

[2] Although not relevant to Grove's situation, the definition of "cash surrender value" also calls for consideration of any loans Grove took against the Policy. (*Id.* at 19.)

[3] Although not relevant here, had Grove requested an increase in the death benefit at any point, then the deduction for that month would have also included "an underwriting charge of $5.00 per thousand dollars of such increase." (*Id.* at 21.)

3

were invested in the separate account. (*Id.*) And the "allocation of risk in investments" in the separate account has not "changed significantly" since the Policy's purchase in 1994. (*Id.* at 6.)

On January 24, 2025, MetLife sent Grove a letter explaining that, although he had paid more than $96,000 in premiums, the cash surrender value for his Policy had dropped to $336.12 and failure to pay an additional $6,643.08 would result in the Policy's termination. (*Id.* at 47–48.) Grove claims he was surprised by this development because although the Policy states that "[e]ach year," MetLife would send Grove "a report showing the current death benefit, cash value and any outstanding policy loans for this policy," as well "the amount and type of credits to and deductions from the cash value during the past policy year," Grove did not receive reports from MetLife with any regularity, let alone on an annual basis. (*Id.* at 7.)[4] He also alleges that MetLife failed to contact him regarding the decreasing value of his Policy, despite having an ethical obligation to do so. (*Id.* at 6.) He notes that several recommendations such as a lowered death benefit, payment of higher premiums earlier, or a different investment vehicle could have "saved" his premiums. (*Id.*) Finally, Grove claims that MetLife never conducted an annual review of his Policy or requested a yearly meeting with him to evaluate the propriety of his investment strategy. (*Id.* at 6–7.)

---

[4] Defendants dispute this allegation and have submitted around 150 pages of annual statements that were issued in connection with the Policy. (*See* Doc. No. 6-2 at 1; *see generally* Doc. No. 6-3.) These annual statements are not, however, properly considered at the motion to dismiss stage, because they are neither indisputably authentic, nor are they integral to or explicitly relied upon by the Complaint. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## II.    PROCEDURAL HISTORY

On March 28, 2025, Grove filed his Complaint against MassMutual and MML[5] in the Court of Common Pleas of Bucks County, Pennsylvania.  (*See* Doc. No. 1-1.)  He brings four counts against both Defendants:  professional negligence (Count I), breach of fiduciary duty (Count II), concerted tortious action (Count III) (Counts I, II, and III, collectively, the "Common Law Claims"), and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count IV).  (*Id.* at 7–10.)  Defendants timely removed the action to this Court on April 28, 2025.  (Doc. No. 1.)  And a few months later, moved to dismiss the Complaint in its entirety.  (Doc. No. 6.)  Plaintiff opposes that motion.  (Doc. No. 7.)

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although a plaintiff does not need to include "detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must "provide the grounds of his entitlement to relief" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted).

In ruling on a motion to dismiss, the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Phillips v.*

---

[5] In July 2016, MassMutual purchased MSI, Metropolitan Life Insurance Company's broker-dealer, from MetLife and merged it into its own broker dealer, MML.  (*See* Doc. No. 6 at 2 n.1.)  Grove's Policy was transferred to MML as part of this deal.  (*Id.* at 2.)

5

*County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "As a general matter," the court "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1426. "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (quotation marks omitted and alterations accepted).

## IV.   DISCUSSION

Defendants contend that all of Grove's claims should be dismissed as time barred or, in the alternative, for failure to state a claim. (Doc. No. 6-1 at 8–9.)[6] The Court begins with Grove's Common Law Claims before turning to his statutory claim for violation of the UTPCPL.

### A.   Common Law Claims (Counts I, II, and III)

First, Defendants argue that the Common Law Claims should be dismissed as time barred. In Pennsylvania, the statute of limitations to file a suit for negligence and breach of fiduciary duty is two years. *See* 42 Pa. Stat. & Cons. Stat. § 5524; *see also Cooper v. Sirota*, 37 F. App'x 46, 48 (3d. Cir. 2002) (professional negligence); *Weis-Buy Services v. Paglia*, 411 F.3d 415, 422 (3d. Cir. 2005) (fiduciary duty). Under Pennsylvania law, the statute of limitations for a concerted conduct claim is equivalent to the statute of limitations for the claim that forms the basis for the concerted action claim. *Woodward v. Nudy*, Civil Action No. 24-1367, 2025 WL 662802, at *5 (E.D. Pa. Feb. 28, 2025) (quoting *Pendergrass v. Pendergrass*, No. 18-478, 2019 WL 9100189, at *3 (E.D. Pa. Jan. 31, 2019)). Therefore, because the substantive claims that form the basis for the concerted tortious conduct claim—professional negligence and breach of fiduciary duty—each have a statute of limitations of two years, the statute of limitations for the

---

[6] Defendants also argue that the claims against MassMutual should be dismissed because Grove inappropriately attempts to pierce the corporate veil. (Doc. No. 6-1 at 6–8.) Because the Court dismisses the Complaint in its entirety on other grounds, the Court need not reach this argument.

concerted tortious conduct is also two years. Pennsylvania uses the "occurrence rule" meaning the statute of limitations begins to run with the occurrence of the action that provides the basis for the Plaintiff's claim. *See Knopick v. Connelly*, 639 F.3d 600, 607 (3d. Cir. 2011).

In his Complaint, Grove claims Defendants breached "their professional duty," "breached their fiduciary duty," and "engaged in concerted tortious negligence," by "not contacting Plaintiff *at all*, let alone holding *any* meetings consistent with ethical norms and industry standards for investment professionals to evaluate the appropriateness of [Grove's] investment for its purpose on a *yearly* basis." (Doc. No. 1-1 at 7–9 (emphases added).) In other words, as pleaded, the bases for Grove's Common Law Claims are Defendants' failure to send annual reports, to conduct annual reviews, and to hold annual meetings about his Policy's investment structure. That means the statute of limitations for each claim began to run in 1995—one year after Grove purchased the Policy and should have realized MetLife was not annually reviewing the accounts associated with his Policy or annually communicating with him about those accounts. Thus, the statute of limitations for Grove's claims ran in 1997, and the Common Law Claims are time barred.

Grove disputes this conclusion, arguing that his "right to institute and maintain a suit" arose when "Grove was first notified that his insurance policy was worthless by a letter dated January 24, 2025." (Doc. No. 7 at 9.) This argument fails. Although Grove only recently realized that the value of his Policy had declined, the Complaint identifies the harmful conduct that led to that loss (i.e., the breach of a duty) as Defendants' failure to conduct annual reviews and to contact or meet with Grove on an annual basis about the Policy. (Doc. No. 1-1 at 7–9.) Because the harm, as pleaded, is the lack of timely review and communication, Grove had the right to institute and maintain a suit the first year Defendant did not conduct an annual review or

contact him about the Policy.  *See Knopick*, 639 F.3d at 607 ("The trigger for the accrual of a legal malpractice action is not the realization of actual loss, but the occurrence of a breach of duty."); *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 572 (Pa. 2007) (same).

Accordingly, the Court grants Defendants' motion to dismiss with prejudice with respect to Counts I, II, and III.

### B. UTPCPL Claim (Count IV)

That leaves Grove's claim for violation of the UTPCPL, which is subject to a six year statute of limitations.  *See* 42 Pa. Stat. & Cons. Stat. § 5527; *see also Fazio v. Guardian Life Ins. Co. of America*, 62 A.3d 396, 411 (Pa. Super. Ct. 2012).  Unlike his allegations in Counts I, II, and III, Grove has not identified the specific facts that form the basis of his UTPCPL claim in Count IV.  (*See* Doc. No. 1-1 at 10.)  Instead, he states in conclusory terms that "Defendant[s] violated the [UTPCPL] by: (xxi) 'Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.'"  (*Id.* (quoting 73 Pa. Stat. & Cons. Stat. § 201-2(4)(xxi).)  Grove does not explain what "conduct" by Defendants was "fraudulent," "deceptive," or likely to create "confusion or misunderstanding."  (*Id.*)

To the extent that Grove meant to base his UTPCPL claim on the same failures referenced in Counts I, II, and III—i.e., Defendants' failure to send annual reports, to conduct annual reviews, and to hold annual meetings about the Policy's investment structure—it is similarly time barred because the statute of limitations would have run in 2001.  *See* 42 Pa. Stat. & Cons. Stat. § 5527.  And to the extent that Grove intends to rely on other conduct as the basis for his UTPCPL claim, he has not pleaded any facts to support such a claim.  Accordingly, Defendant's motion to dismiss with respect to Count IV is also granted.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted. An appropriate order follows.